**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **BRANDY CARY,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **SANDOZ, INC.** | § | **CIVIL ACTION NO.:** _____ |
| | § | |
| *Defendant.* | § | |
| | § | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Brandy Cary ("Plaintiff" or "Cary"), complains of Defendant Sandoz, Inc., ("Defendant" or "Sandoz"). For causes of action Plaintiff shows the Court as follows:

### I.

### INTRODUCTION

1.01    Defendant wrongfully fired Plaintiff from her job in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. '2601, et seq. (the "FMLA").and discriminated and retaliated against Plaintiff, for asserting her rights under the FMLA , as well as interfered with her rights.

### II.

### PARTIES

2.01    Brandy Cary is an individual who is a citizen of the State of Texas.  Plaintiff can be contacted in care of her undersigned counsel.

2.02    Defendant Sandoz, Inc. ("Defendant" or "Sandoz") is a foreign for profit corporation which is operating in Texas and can be served through its agent, Corporation Service

Company dba CSC-Lawyers Incorporating Service Company, 211 7th Street, Austin, Texas 78701-3218.

## III.

## JURISDICTION AND VENUE

3.01     Pursuant to 28 U.S.C. §1331, jurisdiction lies in the United States District Court for the Northern District of Texas, as this action involves a question of the application of federal law, including the Family and Medical Leave Act of 1993 (the "FMLA").

3.02     Venue for Plaintiff's causes of action stated herein lies in the Northern District of Texas because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District pursuant to 28 U.S.C. §1391.

3.03     Venue is proper as Plaintiff lives in this district, the events took place in this judicial district, and the Defendant does business in this judicial district.

## IV.

## FACTUAL ALLEGATIONS

4.01     Plaintiff was hired by Defendant in March 2015 as an Oncology Account Specialist with base pay of $135,000, plus full benefits and a quarterly bonus pay.  Plaintiff worked from home for the Defendant.

4.02     Plaintiff reported to Louis Deppe, Regional Business Director.  Plaintiff received high ranking for annual performance and received an annual raise of around 5% of base pay.

4.03     In 2016 Plaintiff was promoted to Regional Account Manager.

4.04     In 2017 Plaintiff's brother committed suicide and Plaintiff is the one who found

him.  Plaintiff performed CPR but it was too late.  This unfortunate event had a severe impact on Plaintiff mentally and physically.  Plaintiff took bereavement and went on short term disability leave for 12 weeks.

4.05    While Plaintiff was on leave her manager was terminated and Defendant hired a new manager Mark Nieuwenhaus, Regional Business Director.

4.06    Before and after Plaintiff's leave, she was still consistent in being a top performer. Plaintiff ranked one of the highest sales associates for 2017 and received a 5-6% increase in her base pay.

4.07    In 2018 Plaintiff remained high ranking and received annual performance 5-6% increases in base pay.  Plaintiff received numerous awards and accolades throughout this time of her career with Sandoz.  The biggest challenge Plaintiff faced in 2018 was one year after her brother's death Plaintiff realized she was not healing effectively emotionally and mentally in her personal life.  Plaintiff found she needed professional help and took Short Term Disability for about 12 weeks in an inpatient facility and outpatient care during this time.  Plaintiff came back into her role with no issues and "hit the ground running".

4.08    In 2019  Accord Pharmaceuticals wanted to hire Plaintiff for their team and tried to lure her away from Sandoz with their new endeavor.  Plaintiff informed upper management at Sandoz that she had an offer but Anthony Wallace the Head of US Sales personally called Plaintiff and said that Sandoz wanted to counteroffer and they would not let Plaintiff go to any other company because Sandoz was Plaintiff's future.   Defendant gave Plaintiff a $15,000 increase in her base pay immediately and Plaintiff stayed with Sandoz.  Plaintiff was given the highest ranking and performance review at the end of the year and received an additional $15,000 increase in her base pay plus Restricted Stock Units that would vest in 3 years.  Plaintiff was also promoted to

Associate Director, Commercial Business Manager.

4.09    In 2020 COVID hit the country. Plaintiff maintained a relationship and successful sales through different avenues of staying connected with her customers.  Plaintiff had a high ranking and annual performance review and was awarded more RSU's which would vest in 3 years.  Also Plaintiff was given about a 6% increase in her base pay.

4.10    In 2021 Plaintiff started the year with about 6-8 weeks of Short Term Disability for an outpatient coping skills course that was recommended.  Plaintiff returned to work and did what she does best, add products.   The company had a downsizing and Plaintiff was very grateful and appreciative that her role with Sandoz was still very much needed and was not part of the downsizing.  Plaintiff continued to thrive within her role.  Plaintiff ended up winning President's Club for 2021, was awarded more RSU's which would vest in 3 years, 5-6% increase in base pay and again recognized for her hard work with multiple accolades.  Plaintiff won a workout MIRROR for a regional contest.  Plaintiff was interviewed for the National Field Sales Trainer position which would be in addition to her then current role and was chosen for the position! Plaintiff would help train all new hires and work with her peers for any training or resources that may be needed to enhance their own skills and make their jobs even more rewarding.  Plaintiff helped develop training modules, met with leadership across the company and found new areas of opportunity to bring to her team.  At this point Plaintiff's salary was around $250,000 annually, plus a new Tesla as her company vehicle and in addition all of her benefits, stock, and retirement accumulator.

4.11    2022  was  one of the worst years of Plaintiff's life!  Christmas 2021 Plaintiff's husband was removed from their home for family violence and was put on a 60 day Emergency Protective Order from Plaintiff and their children.  Plaintiff was diagnosed with COVID, FLU A

and Strep the second week of January.  Plaintiff was in the process of hiring an attorney for the divorce and trying to adjust to yet again another new manager, Jeff Davisson, Regional Business Director effective March/April timeframe. It was already surfacing around Plaintiff's team that Jeff was not a pleasant person to work for.  Plaintiff has never been one to judge others in advance of any interaction or even basic communication while trying to get to know the individual and form a successful work environment for not only herself but other team members. Plaintiff took it as a challenge to make Jeff feel comfortable with not only herself but also her team.  He seemed very nice and easy to communicate with.

4.12    Unfortunately April 7, 2022 Plaintiff's uncle passed away and he was like Plaintiff's second dad.  Plaintiff took maybe a half day off for the funeral.   No issues with Jeff. The next few weeks life threw Plaintiff another blow.

4.13    On April 22, 2022 Plaintiff's dad was admitted to the hospital and passed away May 5, 2022.  Plaintiff's dad was not only her dad but he was her best friend.  He was an ever present light during what felt like total darkness in her life. Plaintiff took 2 weeks of bereavement and one week of vacation during her dad's illness and then death.

4.14    Plaintiff was supposed to leave for Hawaii May 29, 2022 for the President's Club trip with Sandoz but she did not want to go.  After much influence from family, friends and coworkers Plaintiff decided she could cry under a palm tree vs her backyard in the Texas heat. Plaintiff took her cousin Deann Williams as her guest and was determined to have some relaxation, especially mentally.

4.15    On the last evening of the trip the company took employees on a bus to have a private dinner and cocktails aboard the USS Missouri.  After a fun evening the bus returned all of them to the hotel.  As Plaintiff was getting off of the bus some of the executives stated that the bus

driver would take them to downtown Honolulu for more drinks and bar hopping.  Plaintiff was reluctant because her cousin did not want to go but Plaintiff only had a few chances to hang out with upper leadership of this caliber.  The group was comprised of Plaintiff, Tim de Gavre Vice President, Chief Commercial Officer US Sandoz and his wife, Shannon Buhl Vice President of Sales Sandoz US and her husband, Cassie Dunrud Executive Director National Accounts Wholesale & Trade and her guest, Neel Patel Director of National Accounts Wholesale & Trade and his guest Kirk and Lisa Murtaugh Director Human Resources.  The evening ended at a bar where they were all dancing, drinking and having a great time. It was open tab.

4.16    Unfortunately the night started to unravel when Plaintiff realized or she thought that she had been left at the bar.  Plaintiff went to the restroom and when she returned everyone was gone.  The hotel was about 20-30 minutes from the bar.  Plaintiff went back through to make sure she had not been left and found Cassie Dunrud, Neel Patel and their two guests.  They were not ready to leave so Cassie said that she ordered an Uber for Plaintiff and to go outside and the Uber would be there waiting for her.  There was not an Uber and Plaintiff started to try and find a taxi or some other form of transportation.  Plaintiff was ready to be back at the hotel.  Plaintiff did not understand why everyone else had left and she didn't know.  Plaintiff had a chain of texts from Cassie where she informed Plaintiff that the Uber didn't make it and had been cancelled.  Plaintiff was walking and ended up at a 7-11 convenient store where later in the evening Cassie, Neel and their guests arrived in an Uber to pick Plaintiff up.  Plaintiff had been crying and actually spoke with a police officer who stayed with her until they arrived.

4.17    When they arrived back to the Kahala Resort Plaintiff was first to get out of the back of the van and Neel got out of the front passenger seat.  Neel and Plaintiff were standing in front of the hotel right outside of the Uber having a conversation.  Out of nowhere Plaintiff looked

over and Neel's guest Kirk was coming straight at Plaintiff and Plaintiff thought she was being tackled. Neel yelled at Kirk and said WTF? Plaintiff fell straight back onto the concrete steps with Kirk on top of her. Plaintiff was semi-conscious and just shocked. Everyone helped Plaintiff up slowly after a few minutes and a huge knot immediately formed on the back of Plaintiff's head. They helped Plaintiff into the hotel lobby and asked the staff to get a bag of ice for Plaintiff's head.

4.18    Cassie immediately started telling everyone that Kirk accidentally tripped and fell on Plaintiff. She kept repeating this over and over. Plaintiff had numbness in her toes of her right foot and her head, her back and right arm were in pain. They asked if Plaintiff wanted to go to the emergency room and Plaintiff said no. They were all leaving to go home that next day and Plaintiff just felt sleepy. Cassie walked Plaintiff to her room and the knot on her head was getting bigger.

4.19    Plaintiff went to bed and woke up the next morning with bruising already starting to occur. Plaintiff flew home and slept the entire plane ride. Plaintiff discovered that her symptoms were getting worse over the next few days. Plaintiff ended up in an urgent care and was diagnosed with a severe concussion. Plaintiff was referred to a Neurologist and was scared to inform her new boss of all that had occurred. Plaintiff had an appointment already scheduled with her primary care doctor so she kept that appointment. Plaintiff's primary doctor examined Plaintiff's head as well as the bruising up and down her spine. Plaintiff's primary doctor attempted to get Plaintiff into the Neurologist sooner. Plaintiff ultimately ended up on Short Term Disability and was put through Nerve Conduction tests, 4 MRI's with and without contrast dye and physical therapy for 8 weeks.

4.20    During this time Plaintiff was embarrassed and noticed that no one was reaching out about Plaintiff's incident. Plaintiff knew that she was needing to get better and get back to work! Plaintiff's manager was calling, texting, emailing and wanting to know when she was

returning.  He wanted to know the results of her tests.  He asked Plaintiff to complete an expense report and to check her emails.  He told Plaintiff that she needed to stay in close communication with him and keep him updated on her health status.  Plaintiff did tell him that she was on several medications that make her drowsy, that her foot/toes were still numb but she did feel better after the symptoms of the concussion subsided. Plaintiff was released back to work on September 1, 2022.  Plaintiff's short term disability was from June 6 - Aug. 29, 2022.

4.21    In the early part of the injury Plaintiff's boss informed her that Plaintiff should take personal time off and not sick time.  It ultimately ended up being short term disability in conjunction with FMLA.  Plaintiff essentially felt like between COVID, deaths in her family, President's club trip and then the injury she had barely worked this year and it was already September.

4.22    When Plaintiff returned to work she had a difficult time transitioning back into her role due to major system changes with Defendant's internal network such as computers and cell phones.  Plaintiff did not receive any feedback or instructions on how to ramp back up into her role after being out for so long.  Plaintiff's boss was texting and calling asking why she had missed video/conference call meetings but Plaintiff was not aware of this because her system wasn't updated and her calendar wasn't synching.  Things were not going well.  Plaintiff had training to make up for and so many tasks to catch up on.

4.23    Plaintiff's manager assigned the Trimester Business Review to all team members and Plaintiff was having trouble with that as well.  Plaintiff had difficulty pulling reports and gaining access to resources that she needed in order to prepare for her presentation.  Plaintiff was feeling frustrated, isolated and felt like everyone probably thought she was just a short term disability issue considering how much Plaintiff had been compelled to use it.  Plaintiff made

several attempts to reach out to her boss and he did not reply.  Plaintiff ended up reaching out to

Shannon Buhl VP of Sales on Sunday September 18, 2022 and was crying and told her that maybe

she just didn't need to be at Sandoz since she couldn't seem to catch up and get back into her role

with the time of 9 days that was allotted to her.  Shannon informed Plaintiff that maybe it was time

for a change.  This made Plaintiff feel even worse.

4.24    The next day Plaintiff finally heard from her boss and it was the worst experience

she had ever encountered in 26 years of working in this industry.  Plaintiff's boss Jeff Davisson

was yelling at her and said "Brandy Cary are you in or out?"  I'm tired of your crap and that stunt

you pulled last year.  You and your short term disability.  Take the rest of the day as personal time

off and let me know ASAP what you plan to do with regards to your job"?  Plaintiff was shocked

and didn't know what to say.  Plaintiff sent him a text after the call. Plaintiff apologized for him

being so angry.  Plaintiff reached out to Shannon Buhl via text and described the conversation that

occurred between Jeff and herself.  Plaintiff reached out to HR.  Plaintiff was told by HR that

Sandoz did not feel that way about her.

4.25    Plaintiff reached out to her manager the next morning and apologized for taking

short term disability and told him that she had no choice but to leave the company given his

attitude.  Plaintiff felt defeated and that she had somehow let the company down.  He told Plaintiff

that her two weeks would be effective from that date Sept. 20, 2022 and her last day would be

October 4, 2022.  Plaintiff's boss told her to write an email and who all to copy.  Plaintiff did as

he instructed.  Plaintiff didn't understand how she ended up in this predicament.

4.26    Plaintiff called HR crying and barely remembers that phone call.  Plaintiff did ask

HR why her injury wasn't filed  under worker's comp because it was getting expensive with all of

her copays but was informed that the company event was over when the bus returned to the hotel

the first time.  Lisa Murtaugh also told Plaintiff that just to be sure she would check with the company legal team and get back to Plaintiff.  Plaintiff never heard back.

## V.

### FIRST – FOURTH COUNTS

#### FAMILY AND MEDICAL LEAVE ACT (FMLA)
#### DISCRIMINATION, INTERFERENCE AND RETALIATION

5.01   The foregoing paragraphs in this Complaint are incorporated in this count by reference as fully as if set forth at length herein.

5.02   Plaintiff was an eligible employee under the FMLA.  Plaintiff had worked for Defendant for at least twelve (12) months and had worked at least 1,250 hours during the twelve (12) months prior to taking the leave.

5.03   Defendant was subject to the provisions of the FMLA. Defendant employed at least fifty (50) employees within a seventy-five (75) mile radius of Plaintiff's work site for twenty (20) or more work weeks in the prior or current calendar year.

5.04   At the time of the discharge, Plaintiff had suffered from one or more "serious health conditions" as defined by the FMLA.  29 U.S.C. 2611 (11).  In particular, Plaintiff was suffering with severe depression.  This was also a "serious health condition" because it resulted in a period of incapacity, which required treatment by physicians and prescription medications.  Plaintiff is under the continuing care of her physicians for treatment for this and related conditions.

5.05   Defendant interfered with Plaintiff in the exercise of her FMLA rights by terminating her employment after FMLA leave.  Plaintiff made good faith efforts to submit all respective medical certifications for her FMLA leave.

5.06    The FMLA's interference provision makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise," any substantive FMLA right. 29 U.S.C. § 2615(a)(1); *see also Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004); *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). Notably, a claim that an employee was terminated for taking FMLA leave is cognizable under *both* an interference or prescriptive claim under 29 U.S.C. §2615(a)(1), or under a retaliation or proscriptive claim under §2615(2).  *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 n.2 (6th Cir. Ohio 2007).

5.07    As a result of her wrongful termination, Plaintiff has suffered damages in the form of lost wages and benefits. Plaintiff is entitled to back pay, plus interest on that amount, and front pay to compensate her for that loss. 29 U.S.C § 2617(a)(1)(A)(i)-(ii).

5.08    The aforementioned acts were and are a willful violation of the FMLA, and entitle Plaintiff to recover damages as provided by 29 U.S.C. 2617, including liquidated damages. Plaintiff further seeks reinstatement to her position or a comparable position with reinstatement of benefits and seniority time.

5.09    As a result of Defendant's actions, Plaintiff has found it necessary to hire the services of the undersigned attorneys, for which Plaintiff seeks further relief.  29 U.S.C § 2617(a)(3).

## VI

### FIFTH COUNT

### WORKERS COMPENSATION DISCRIMINATION

6.01 The foregoing paragraphs of this Petition are incorporated in this Count as fully as if set forth at length herein.

6.02 Defendant discriminated against Plaintiff and discharged Plaintiff because Plaintiff asked about filing a workers' compensation claim. The discrimination against Plaintiff and Plaintiff's discharge violated Section 451.001 of the Texas Labor Code which reads as follows:

**§451.001. Discrimination Against Employees Prohibited**

A person may not discharge or in any other manner discriminate against an employee because the employee has:

    (1) filed a workers' compensation claim in good faith;

    (2) hired a lawyer to represent the employee in a claim.

    (3) instituted or caused to be instituted in good faith a proceeding under Subtitle A; or

    (4) testified or is about to testify in a proceeding under Subtitle A.

6.03 As a result of Plaintiff's discharge, Plaintiff has suffered lost earnings, and damages to Plaintiff's earning capacity. Plaintiff has also suffered extreme mental anguish and emotional distress as a result of the manner in which Plaintiff was treated as an employee by Defendant and the manner in which Plaintiff was discharged. Plaintiff has had difficulty in sleeping, has become extremely irritable and nervous, and his personal relationships have suffered. As a result, Plaintiff has suffered damages in an amount in excess of the minimum jurisdictional limit of this Court.

6.04 Such discrimination by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life and other nonpecuniary losses. Further, this discrimination was done by Defendant with intentional malice or with reckless indifference to Plaintiff's protected rights. Such discrimination constitutes gross, wanton, reckless, and/or intentional violation of Plaintiff's rights under the Texas Labor Code. Plaintiff is therefore also entitled to recover punitive damages in a sum which is in excess of the

minimum jurisdictional limit of this Court. Plaintiff is also entitled to recover all costs of Court, expert fees, and attorneys' fees.

## VII.

## JURY DEMAND

7.01 Plaintiff demands trial by jury on all issues raised by this Complaint.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have the following relief against Defendant:

1.    Judgment for back and front pay and all past and future lost benefits;

2.    Judgment for actual damages in the amount of past and future lost earnings and benefits, and damages to past and future earnings capacity;

3.    Compensatory damages for the humiliation, damage to reputation, mental and emotional distress, and pain and suffering Plaintiff has experienced and endured as a result of the discriminatory and retaliatory actions of Defendant;

4.    Damages for past and future mental anguish and emotional distress and damages to reputation;

5.    Exemplary damages in an amount determined by the trier of fact;

6.    Prejudgment and postjudgment interest at the maximum legal rate;

7.    Preliminary and permanent injunctive relief;

8.    Attorney's fees;

9.    Expert's fees;

10.   All costs of court; and

11.   Such other and further relief to which Plaintiff may be justly entitled.

Dated: January 11, 2023

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

*W. D. Masterson*

By:_____
      W.D. MASTERSON
      State Bar No. 13184000
      3141 Hood Street, Suite 500
      Dallas, TX  75219
      (214) 969-9099 - Telephone
      (214) 953-0133 - Fax
      wdm@kilgorelaw.com

      **ATTORNEYS FOR PLAINTIFF**
      **BRANDY CARY**